UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | CASE NUMBER: 1:19-mj-332 |
| The premises known as the offices of Facebook, Inc., 1601 Willow Road, Menlo Park, California 94025, for information associated with Facebook User ID "100005024655242" | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANT** |

State of North Dakota    )
                         ) ss
County of Cass           )

I, Allen Bohle, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application for search warrant for information associated with a Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California, with offices at 1601 Willow Road, Menlo Park, California 94025.  The information to be searched is described in the following paragraphs and in Attachments A and B, attached hereto.  This Affidavit is made in support of an application for a search warrant under 18 U.S.C.  §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the Government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID set forth in Attachment A.

2.      I am a Police Officer for the City of Mobridge Police Department (MPD), Mobridge, South Dakota.  I have been a certified law enforcement officer for approximately 16 years with the MPD, holding the rank of Patrol Officer from 2003 to 2012, and holding the rank of Captain from 2012 to 2015.  I have held the position of investigator from 2015 to the present time.  Prior to my work with the City of Mobridge, I was employed as Police Chief of the City of Selby for

1

approximately 2 years.  I am federally deputized and currently assigned to the Federal Bureau of Investigation (FBI) as a Task Force Officer (TFO) with the Northern Plains Safe Trails Drug Enforcement Task Force (NPSTDETF) in Pierre, South Dakota.  I have been involved in numerous narcotic investigations during my time with the MPD.  I have been involved in numerous investigations including, but not limited to, narcotic violations, burglaries, assaults, and general patrol duties.  I have interviewed hundreds of suspects, victims, and witnesses for crimes pertaining to my criminal investigations.

3.     The facts and information contained in this Affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses.  This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of 21 U.S.C.  §§ 841 and 846 (Conspiracy, Distribution, and/or Possession with Intent to Distribute), have been committed by Eli Wright.  There is also probable cause to search the information described in Attachment A for evidence, contraband, or fruits of these crimes, as further described in Attachment B, hereto.

## PROBABLE CAUSE

5.     I, Allen T. Bohle, am the case agent for an investigation regarding the distribution of methamphetamine on and around the Standing Rock Indian Reservation.

6.     I, TFO Bohle assisted BIA Law Enforcement with the execution of a Search Warrant for the Eli Wright residence on August 26, 2019, a residence located within the boundaries of the Standing Rock Indian Reservation.  During execution of this warrant, BIA Officers discovered and seized paraphernalia containing methamphetamine residue.

I was assigned the duty of interviewing individuals present. I gathered information from Eli Wright, Raphael Sea Walker, Donald McLaughlin, Jessica Pleets, and Stephanie Wright. Miranda warnings were read to all parties

2

interviewed. All indicated they understood their rights and agreed to talk to me at that time. I was able to gather the following information:

a. Wright stated we would find paraphernalia and residue inside the residence. Wright stated all methamphetamine was smoked earlier that day.

b. Wright utilizes Facebook, Wright's Facebook ID was "Eli Felix" with Facebook user ID #100005024655242.

c. Raphael performs jobs for Wright.  Wright pays Raphael with cash, methamphetamine, and marijuana. Raphael estimates Wright has paid him with methamphetamine approximately 4-5 times.

d. Donald McLaughlin,  Jessica Pleets,  Eli Wright, and Raphael all smoked methamphetamine earlier that day in the residence. The methamphetamine was furnished by Wright.

e. Raphael smokes methamphetamine frequently while working for Wright. Wright furnishes the methamphetamine for Raphael.

f. Raphael utilizes Facebook, Raphael's Facebook ID was "Raphael SeeWalker" with Facebook user ID #100031687583403

g. Stephanie Wright lives in the other residence, located on the same property as Eli Wright.

h. Stephanie was in possession of a user amount of methamphetamine. Stephanie used methamphetamine that same day and commonly smokes methamphetamine daily.

i. Stephanie receives her methamphetamine from Wright weekly.

j. Stephanie has received methamphetamine from Wright approximately 35 times in the past year.

k. Jessica Pleets utilizes Facebook, Jessica's Facebook ID was "Jesse Pleets" with Facebook user ID #100018846048297.

7.     BIA SA Isaiah Soldier and I interviewed a source of information ("Source") on August 30th, 2019, in rural Fort Yates, North Dakota. Source has

provided reliable information in the past resulting in convictions and is in a
position to testify. I was able to gather the following information:

    a. Eli Wright and Misty Painte receive methamphetamine from Minot,
       ND.

    b. Source rode with Misty twice when Misty picked up heroin and
       methamphetamine in Minot, ND. Misty picked up a pound of black
       tar heroin and a quarter ounce of China White on one of those
       trips.

    c. Source has seen Wright in possession of approximately 20 lbs of
       methamphetamine at one time. Source has observed Wright in
       possession of an estimated 100 lbs of methamphetamine in the
       past two years.

    d. Source has seen Wright in possession of firearms.

    e. Misty sells Heroin. Source has used heroin received from Misty.

    f. Source has observed Misty in possession of an estimated 5 lbs of
       heroin in the past year.

    g. Wright utilizes Facebook to contact individuals concerning
       methamphetamine distribution.

    h. Source has received methamphetamine approximately 100 times
       from Ambre McLaughlin.

8.    I, TFO Bohle met with John Stringer on September 10, 2019, at
the Walworth County Jail, where he was being housed. I read Stringer his
Miranda rights. Stringer stated he understood his rights and agreed to talk to
me at that time. I was able to gather the following information from Stringer:

    a. Misty Painte and Eli Wright deal with methamphetamine and
       heroin.

    b. Stringer purchased methamphetamine from Wright for a female,
       Stringer referred to as Grandma.

    c. Stringer has seen Wright and Misty with ½ pound of
       methamphetamine.

    d. Misty commonly carries a firearm. Wright keeps a firearm under
       the bar in his residence and one in his bedroom at his residence.

    e. Ronald Yellow Jr. generally receives ½ ounce of methamphetamine
       at a time to distribute.

9.     I, TFO Bohle spoke with Lars Hinton on September 13, 2019, while
assisting the BIA with the execution of a search warrant at the Ronald Yellow
Jr. residence. Lars was in possession of a syringe, over 3 grams of
methamphetamine and paraphernalia. Lars was escorted to my vehicle where I
read Miranda to Lars. Lars stated he understood and agreed to talk to me at
that time. I was able to gather the following information from Lars:

    a. Lars left Ron's residence at 0230 hours, on September 13. Lars
       drove to Bismarck, ND, where he purchased methamphetamine
       from a male called "Rico" or Juan. Lars purchased 5-6 times from
       Rico for a total of ½ ounce beginning August 25th. Rico generally
       is in possession of a ½ ounce of meth.

    b. Lars talks with Rico on Facebook Messenger using the account of
       "Lars BirdHorse" with Facebook ID #100039558817743

    c. Rico's Facebook ID is "Raw Macho". I was able to locate Rico's ID
       as "Raw Rican Macho" with Facebook ID #100033092243464

    d. Lars sold meth the night through Ron.

    e. Lars has observed Ron sell methamphetamine.

    f. Lars communicates with Ron on Facebook Messenger. Lars talked
       to Ron while on the methamphetamine run to Bismarck.

10.    I, TFO Bohle met with Ronald Yellow Jr. at the Fort Yates
Detention Center. I explained to Ron a search warrant had been executed on
his residence. I read Ron his Miranda Rights to which he stated he understood

5

his rights and agreed to talk to me at that time. I was able to gather the following information from Ron:

    a.  Ron stated there was paraphernalia in his residence.

    b.  Lars Hinton tripped to Bismarck that morning and purchased 8 grams of methamphetamine from Heather Bird Horse and Rico her boyfriend. This is the 2nd time Ron has purchased from Heather.

    c.  Heather Bird Horse utilizes Facebook; Heather's Facebook ID is "Heather Birdhorse" with Facebook ID #613791262

    d.  Ambre McLaughlin is involved in area methamphetamine distribution. Ron estimates he has received methamphetamine six times in 2019 for a total ¾ of an ounce.

    e.  Ron estimates he has received methamphetamine fifty times in 2019 for a total of 25 ounces from Eli Wright. Ron paid Wright $425 for a ½ ounce of methamphetamine.

    f.  Ron witnessed Eli Wright sell meth to Candice Eagle,  and Jessica Pleets.

    g.  Misty Painte picks up methamphetamine in Minot ND for Wright.

    h.  Misty has attempted to sell Ron methamphetamine in the past.

    i.  Ron estimates he has received methamphetamine 20 times from John Stringer for a total of 10 ounces of methamphetamine. Ron paid Stringer $550 for a ½ ounce of methamphetamine.

    j.  Ron estimates he has received methamphetamine 180 times since August 2019 from Serenity Bear King and Lawrence Bear King for a total of 90 ounces of methamphetamine.

11.    Based on my experience on and around the Standing Rock Indian Reservation, I discovered it is common practice to utilize Facebook to communicate and is not common for individuals to pay cellular fees allowing them to utilize cellular services. Individuals commonly take advantage of free Wi-Fi in the area, utilizing free Facebook services.

12.    Based on my training and experience, I am aware that individuals involved with the distribution of controlled substances communicate through multiple mediums including Facebook, or other social network messages.  I am further aware that persons involved in the distribution of controlled substances meet with purchasers at various locations, and that the data of the locations visited may be logged on a Facebook application.

13.    Based on my training, knowledge, and experience as a law enforcement officer, I know that persons involved in the distribution of controlled substances often have photographs and/or home videos and in particular photographs and/or videos of co-conspirators, of assets, and/or controlled substances.  I have been involved in drug investigations where photographs and/or videos have been found during search warrants.  These photographs and/or videos have shown persons smoking, using, or ingesting, as well as persons flaunting their drugs and/or cash.

14.    I completed an electronic preservation request with Facebook, Inc. records to preserve all information in the account associated with Facebook User ID set forth in Attachment A.  That preservation request was made and logged with Facebook on September 16, 2019, Case #3641049.

15.    Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

7

16.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

17.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

18.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the

application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

19.   Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20.   Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when he or she uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have

that user tagged in them.

21.    Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a "Chat" feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a "Video Calling" feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

22.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

24.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25.    Each Facebook account has an activity log, which is a list of the

user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26. "Facebook Notes" is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

27. The "Facebook Gifts" feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

28. Facebook also has a "Marketplace feature," which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

29. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

30. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following

information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; notes; wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

31.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

32.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support

services, as well as records of any actions taken by the provider or user as a result of the communications.

33.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses; investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its

services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

34.   Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

35.   I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the Government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

14

## CONCLUSION

36.     Based on the foregoing, I request that the Court issue the proposed search warrant.

37.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, and used in 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A).

38.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING AND DELAYED NOTIFCATION

39.     I further request that the Court order that all papers filed in support of this matter, including the Application, Affidavit, Search Warrant, Search Warrant return and inventory, Motion and Order to Seal, Order of Non-Disclosure of Search Warrants, and all other related documents in this case, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public, nor known to all of the targets of the investigation.

40.     Based on my training and experience, I further request that the Court command Facebook, Inc., to delay notification of the search warrant obtained herewith to the subject of the search warrant, pursuant to 18 U.S.C. § 2705, because notification of the search warrants issued in this matter may adversely affect the investigation in the following ways: destruction of or tampering with evidence; or otherwise seriously jeopardizing an investigation or unduly delaying a trial.

41.     I have recently reviewed the Facebook account that is the subject of this Affidavit, and attest that the account remains active.  Should the subject of this Affidavit become aware of the search warrant, he will likely shut down his account thereby destroying any further relevant evidence of criminal violations thus seriously jeopardizing the investigation.

42.     I am aware that in cases involving the distribution of controlled substances, individuals communicating through social media to further their distribution efforts believe their communications will remain confidential with those to whom the communications are intended and certainly not accessible to law enforcement.  Further, in the drug culture, those assisting or communicating with law enforcement are deemed to be "snitches" and snitches are not tolerated by others engaged in drug distribution activities.  Should the subject of this affidavit or others become aware of the search warrant, the subject may be labeled a snitch or the subject may believe others tipped off law enforcement to his account.  Either way, the physical safety of the subject and/or others may be endangered, as a result of the search warrant being made known to the subject of this affidavit.

43.     Similarly, snitches and others communicating with the subject or having knowledge and information about the subject's drug distribution activities, may become potential witnesses.  If the search warrant is made known to the subject of this affidavit, pressure and/or other forms of intimidation may be applied to potential witnesses to not cooperate with law enforcement.

44.     Accordingly, there is good cause to seal all of the documents because

their premature disclosure may seriously jeopardize the investigation, and there is good cause to delay notification of the search warrant to the Facebook user at issue due to the likelihood of an adverse result as set forth above.

Respectfully submitted,

Allen T. Bohle,
Task Force Officer
Northern Plains Safe Trails Drug Enforcement Task Force

Subscribed and Sworn to before me via telephone pursuant to Rules 41(d)(3) and 4.1, Federal Rules of Criminal Procedure.

9/19/2019
Date

Fargo, North Dakota
City and State

ALICE R. SENCHAL
UNITED STATES MAGISTRATE JUDGE

17